2023 IL App (4th) 220891
NO. 4-22-0891
IN THE APPELLATE COURT
FOURTH DISTRICT

FILED
November 13, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| JUMAR A. HOUSE, | ) | No. 12CF254 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Cavanagh and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1        In October 2012, defendant, Jumar A. House, was found guilty, following a bench trial, of attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)), aggravated battery with a firearm (*id.* § 12-3.05(e)), and possession of a weapon by a felon (*id.* § 24-1.1(a)). The trial court later sentenced defendant to a total of 33 years in prison.

¶ 2        In March 2015, defendant filed a petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), alleging that he was actually innocent based upon affidavits from newly discovered witnesses. In November 2021 and August 2022, the trial court conducted a third-stage evidentiary hearing on defendant's petition, at which three new witnesses testified on defendant's behalf.

¶ 3        In September 2022, the trial court denied defendant postconviction relief, finding that defendant did not meet his burden of proof.

¶ 4         Defendant appeals, arguing that the trial court erred by denying his petition because defendant proved by a preponderance of the evidence that the testimony of the three witnesses at the third-stage evidentiary hearing was newly discovered, material, noncumulative, and conclusive.

¶ 5         We disagree and affirm.

¶ 6                                    I. BACKGROUND

¶ 7                         A. The Charges and the Bench Trial

¶ 8         In March 2012, the State charged defendant with attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)), aggravated battery with a firearm (*id.* § 12-3.05(e)), and possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges alleged generally that in February 2012, defendant, a convicted felon, shot Norman Gates, causing injury.

¶ 9         In October 2012, the trial court conducted defendant's bench trial, at which the following evidence was introduced.

¶ 10                                    1. *Eric Esser*

¶ 11         Peoria police officer Eric Esser testified that on February 17, 2012, at 1:19 a.m., he was dispatched to Club Pounders, located at 315 Main Street in Peoria, Illinois, after another police officer heard gunshots coming from that location. Upon arrival, Esser observed bullet holes in two vehicles parked in front of the club—a tan Honda and a black BMW. Both cars were parked on Main Street directly in front of Club Pounders, facing south toward Adams Street. Esser determined that the owner of the BMW was Gates.

¶ 12         At some point after the police arrived on the scene and had been investigating, Gates returned to his car. Officers prevented Gates from leaving the scene, and he waited at the corner of Main and Adams Streets with two other male companions (later identified as Nicholas

Pannell and Eddie Binion). After about 45 minutes, the police allowed Gates to leave. While he was on the scene, Gates made no mention of being injured.

¶ 13    Shortly thereafter, at 3:09 a.m., Esser was dispatched to Saint Francis hospital for a report of a gunshot victim who had been outside of Club Pounders. Upon arrival, Esser discovered that the victim was Gates, who was receiving medical treatment for a gunshot wound to his right arm.

¶ 14                               2. *Norman Gates*

¶ 15    Norman Gates testified that he was with Pannell and Binion at Club Pounders on Main Street during the early morning hours of February 17, 2012. Club Pounders was located directly across the street from the Peoria County courthouse. Gates stated that, as he was leaving the club, "[t]here was some shots fired" and he ran. He eventually came back for his vehicle (a BMW) but was stopped by the police from leaving the scene in his car. Gates allowed the police officers to process his car for evidence of the shooting. He never told any of them that he had been injured. In fact, Gates did not know he was injured until later that evening. Gates did not see who shot him. Gates also testified that he was convicted in 2007 of possession of a weapon by a felon.

¶ 16    On cross-examination, Gates testified that he learned he had been shot when he got home and took his coat off. He drove himself to the hospital.

¶ 17                               3. *Nicholas Pannell*

¶ 18    Nicholas Pannell testified that he was at Club Pounders on February 17, 2012, with Gates and Binion. The trio had driven to the club in Gates's BMW. When they left Club Pounders, Pannell saw defendant walk across the street "from his car to the front of the building." The prosecutor asked Pannell, "[D]id you then leave or did you stay around the vehicle for a period of

time? Pannell answered, "I stayed there." The prosecutor then asked, "What happened?" Pannell answered that he turned around and saw defendant aiming a gun and then firing it at him, Gates, and Binion. He, Gates, and Binion all ran when defendant began firing at them. They ran to the corner and hung around there until they walked back "a little down the street from the club." Pannell explained that, although the police arrived, he never spoke with an officer that evening. He did speak with Detective Timothy Moore on February 21, 2012, at which time Pannell identified defendant from a photo lineup as the person who shot at him, Gates, and Binion on February 17.

¶ 19 Pannell testified that he had a prior felony conviction for domestic battery and a misdemeanor conviction for theft. He was also awaiting sentencing on a charge of possession of a weapon by a felon in Peoria County.

¶ 20 On cross-examination, Pannell testified that he and Gates had been standing by Gates's car just prior to the shooting and they "ha[d] words" with defendant at a distance of six or seven feet. Pannell stated that, when they exchanged words with defendant, defendant was coming from his own car, which was parked across the street from Gates's car. Pannell had known defendant since 2003 and acknowledged that he did not like defendant. Pannell testified that he never told the police what he had seen until Detective Moore came to his house on February 21. Moore told Pannell that the police had obtained a surveillance video of the shooting, but Moore never showed Pannell the video.

¶ 21 4. *Timothy Moore*

¶ 22 Timothy Moore, a Peoria police detective, testified that he obtained surveillance footage of the shooting from the owner of a neighboring business, Richard's On Main. A DVD containing the video footage was admitted into evidence and played for the trial court. Moore

further testified that he went to Pannell's house to interview him on February 21, 2012. Pannell initially claimed he did not see the shooting, but when Moore told Pannell that he had video footage of the shooting, Pannell told Moore what had actually happened. Moore showed Pannell a six-person photo array, and Pannell identified defendant as the shooter.

¶ 23                                5. *Scott Hulse*

¶ 24        Scott Hulse, a Peoria police officer, testified that while he was at the crime scene following the shooting, he stopped Gates from driving away in his BMW until other officers could process Gates's car for evidence. Approximately two hours after the shooting, around 3:30 a.m., Hulse performed a traffic stop on a vehicle being driven by defendant. Hulse recorded the stop with his squad car's camera. The trial court admitted a video of the traffic stop into evidence and viewed it in open court. The video showed, among other things, defendant's performance of field sobriety tests.

¶ 25                              6. *The Trial Court's Ruling*

¶ 26        The trial court found defendant guilty of all three counts and stated as follows:

"The Court considers the following information consistent with—and in spite of and notwithstanding the initial contact by Mr. Pannell with the police and the version of events that he provided to them subsequently being advised that there was a video. But having never seen the video he then gave a version wherein he identified [defendant] as the shooter. The video demonstrates that Mr. Pannell and an individual walking across Main Street had an encounter, at least a dialogue with some gesturing done by the individual in the street. And within a very short few minutes thereafter, the individual was found on the video discharging a weapon. You can see the plumes of smoke run from the location of their parked vehicle and

the individual is thereafter chased.

Subsequently, there was a photo identification lineup and Mr. Pannell also identified [defendant] in that photo lineup as well. The Court notes the impeachment by his prior conviction as well as his prior inconsistent statement, but notwithstanding that, the video evidence which particularly later identifies by dash cam the arrest of [defendant] while under—driving under the influence incident identifies stature of the individual in both videos, the clothing worn, the marking on the respective clothing, the hat, length of hair, all of which are, to the Court's conclusion, satisfactory proof beyond a reasonable doubt that [defendant] indeed was the shooter."

¶ 27 In April 2013, the trial court sentenced defendant to concurrent terms of 33 years in prison for attempt (first degree murder) and 8 years for possession of a weapon by a felon. (The aggravated battery conviction merged with the attempt conviction.)

¶ 28 B. The Direct Appeal

¶ 29 Defendant filed a direct appeal, arguing that he (1) was not proven guilty of attempt (murder) beyond a reasonable doubt because the only evidence connecting him to the crime was Pannell's testimony, which was not credible, (2) received ineffective assistance of counsel when his attorney failed to cross-examine (a) Pannell about his identification of defendant and (b) Gates about whether Gates exchanged words with defendant prior to the shooting, and (3) was denied a fair trial based upon Moore's *ex parte* statements to the trial judge following defendant's bench trial, thanking the judge for finding defendant guilty. The Third District Appellate Court affirmed defendant's convictions. *People v. House*, 2014 IL App (3d) 130312-U.

¶ 30 C. The Postconviction Proceedings

¶ 31                    1. *The Petition and First-Stage Proceedings*

¶ 32        In March 2015, defendant, with the assistance of counsel, filed a petition for postconviction relief pursuant to the Act alleging, relevant to this appeal, that (1) the trial judge "failed to properly consider videotaped evidence presented in the trial of this cause which clearly demonstrate [*sic*] that the single witness herein was not candid with the court regarding any identification of the petitioner as the offender" and "the adoption by this Honorable Court of [the trial judge's] findings were [*sic*] erroneous" and (2) "newly discovered evidence has been brought to the attention of counsel which was not present at the time of trial which demonstrate[s] the petitioner's actual innocence herein." Defendant attached to his petition the affidavits of six witnesses: Mario Davis, Albert Price, Erika Gibson, Leola Green, Eddie Rodgers, and Kenwaun Murray. Defendant later supplemented his petition with a seventh affidavit, from Corey Hunter.

¶ 33                    2. *The Second-Stage Proceedings*

¶ 34        In May 2017, the State filed a motion to dismiss defendant's petition.

¶ 35        In September 2017, following a hearing, the trial court entered a written order dismissing defendant's petition after finding that defendant did not meet his burden of establishing a substantial denial of his constitutional rights.

¶ 36        Defendant appealed the second-stage dismissal of his petition, and in July 2020, the Third District Appellate Court reversed and remanded for a third-stage evidentiary hearing, concluding that the affidavits attached to the petition, taken as true and liberally construed, made a substantial showing of actual innocence. *People v. House*, 2020 IL App (3d) 170655, ¶ 33.

¶ 37                    3. *The Third-Stage Proceedings*

¶ 38        On two separate dates in November 2021 and August 2022, the trial court conducted a third-stage evidentiary hearing on defendant's petition at which, of the seven affiants,

- 7 -

only Murray, Hunter, and Davis testified. Defendant and Moore also testified.

¶ 39                              a. Kenwaun Murray

¶ 40        Murray testified that he was currently serving a sentence in the Illinois Department of Corrections (IDOC) for residential burglary and aggravated battery convictions from 2014. When asked if Murray knew defendant, Murray answered, "He used to cut my hair. He was a friend of mine." Murray learned defendant was arrested in 2010 or 2011. He stated, "My recollection is kind of bad, but I know he got locked up" for a shooting "or something like that." Murray was not present for the shooting but testified that he had an encounter with Pannell sometime after the shooting.

¶ 41        Specifically, Murray testified that he was familiar with Pannell, having met him twice: once at a bar in Galesburg, where they got into an altercation, and again at a gas station or convenience store in Galesburg. Murray stated the encounter at the gas station occurred in late February or early March 2014. When Murray saw Pannell, Murray asked him "[w]hy did he lie on [defendant], *** put that man in jail?" Murray testified that "[Pannell] ended up telling [Murray] how [Pannell] couldn't go to jail for—what was it—a gun case or something like that. And so he— he said he told—he told the detective that. He told him it was [defendant]. He said [defendant] was the shooter or something." Murray testified that he was shocked by what Pannell told him and "just got in [his] car and left." When asked if he ever reached out to anybody with the information he received from Pannell, Murray answered, "I got a call from [defendant] sometime in March, and I told him [what Pannell had said]. *** And here I am today."

¶ 42        On cross-examination, Murray could not remember the name of the gas station but was able to identify the intersection. Murray also testified that he was not present for defendant's trial, but he did attend defendant's sentencing hearing. When asked if he wrote his affidavit,

Murray testified that it was sent to him and he signed it and sent it back. (The State did not ask who sent it to Murray or to whom Murray returned the signed affidavit.)

¶ 43                                    b. Corey Hunter

¶ 44        Hunter testified that he knew defendant as an acquaintance but they were not friends. Hunter stated he was present outside of Club Pounders at the time of the shooting, standing directly across the street from the club, on the courthouse side of Main Street. When asked what time the shooting occurred, Hunter answered, "I know it was a little bit after midnight." He stated that he did not have anything to drink and was smoking a cigarette, talking to a couple of people that he knew.

¶ 45        When asked to describe how the shooting occurred, Hunter answered, "A guy pulled up in the car. He got out. After he got past us, he started firing shots, kind of chased the people a little bit. And then he came back and got in his car and drove off." Hunter said the car was black but he did not know the make and model. Hunter explained that the car had pulled up on Main Street, driving away from Adams Street, and was consequently on the same side of the street as Hunter. Hunter described the shooter as a dark-complected, black male who was about six feet tall. He was wearing "dark black clothes," including a leather parka. Hunter stated that the person he saw shooting was not defendant. He did not know the shooter but had seen him around town before.

¶ 46        Hunter did not remember exactly when he found out that defendant had been convicted for the shooting, but after learning of the conviction from family and friends, Hunter "told them I was there and that [defendant] wasn't the one who did it." Hunter stated "they" asked if he would be willing to testify and he told "them" yes. (Hunter did not specify, nor was he asked, who he meant by "they" when answering these questions.)

¶ 47        Hunter also testified that he was familiar with Pannell and did not see him at the scene of the shooting. Hunter stated that he knew Gates and believed he saw Gates at the shooting.

¶ 48                                c. Mario Davis

¶ 49        Mario Davis testified he was in the custody of the Peoria County Sheriff's Office for pending charges of unlawful use of a firearm and possession of a controlled substance. He acknowledged that he had two prior felony convictions for possession of a controlled substance. Davis stated he was present when the shooting occurred outside of Club Pounders. When asked what time the shooting occurred, Davis answered, "It was around like 1:00. 1:30 to—between 1:30 and 2:00 in the morning." He had consumed "probably *** a few beers" but was not drunk. When asked if he had consumed any drugs, he answered, "I smoke weed, but I don't—I mean, I don't be out of my mind."

¶ 50        Davis testified that he was sitting outside talking to "female friends" when he noticed three or four people arguing in the middle of the street. Davis saw "a dark-complected individual cross the street, *** pull out a firearm, and start shooting *** southbound on Adams." Davis did not remember if there were streetlights, but Davis testified that he got a good look at the shooter. Davis testified that he saw the shooter's face and the shooter was not defendant. Davis was familiar with defendant, having seen him around town before, but he did not have any relationship with him.

¶ 51        Davis testified that he was familiar with Gates and heard that he had been shot. Davis further testified that he learned a week or two after the shooting that defendant had been charged. Davis stated that he did not go to the police to tell them that defendant was not the shooter because he "was scared of the police," having been arrested by them numerous times.

¶ 52        The prosecutor also asked Davis about the preparation of his affidavit. Davis

testified that he was never asked by anyone to provide his affidavit. Instead, about two weeks after the shooting, he decided on his own to write the affidavit to "get\*\*\* the truth out." His girlfriend typed it up for him, and he mailed it to the circuit clerk without providing a case number. The prosecutor asked, "[S]o then it took you about two-plus years to have your girlfriend write up a couple sentences?" Davis answered, "Yes, sir."

¶ 53                                        d. Defendant

¶ 54          Defendant testified that he was not at Club Pounders the night of the shooting. He testified that he knew who Gates was, having seen him a few times prior to the shooting, but he did not know him other than that. Defendant stated that he did not see Gates on the night of the shooting, nor did he have any dispute of any kind with Gates.

¶ 55          Defendant also testified that he did not know Pannell. Defendant said that he was aware that Pannell testified during the trial that Pannell knew defendant, but defendant did not know Pannell. Defendant stated that he knew of Pannell since the trial, but defendant did not know Pannell before the trial and never saw him on the night of the shooting.

¶ 56          Defendant testified that he had "a lot of \*\*\* interactions" with Detective Moore prior to the shooting. Defendant claimed that, when Moore arrested him, Moore said he knew that defendant was not there. Defendant testified that Moore told him that Gates stated he never saw defendant at the scene and Moore was only charging defendant with the crime because Moore did not like defendant due to defendant's past.

¶ 57          Defendant testified that he had known Murray for a few years because he cut Murray's hair. He stated that he knew Hunter and Davis from going out to the clubs, but "[t]hey're not friends."

¶ 58                                        e. Detective Moore

¶ 59 Moore testified that after being assigned to investigate the shooting, he reviewed (1) reports written by other officers who responded to the shooting and (2) obtained a surveillance video from Richard's On Main. He did not recall precisely how he learned of Pannell's presence, but he stated that Pannell was identified as a bystander to the shooting. When Moore reviewed the surveillance video, he recognized defendant, Gates, Pannell, and Binion.

¶ 60 Moore interviewed Pannell, who initially claimed that he was at a bar around the corner from Club Pounders when the shooting occurred. Moore told Pannell that he had obtained a video of the incident, at which time Pannell gave Moore a statement that "kind of mirrored what the video showed, that he was standing with [Gates] when he and—when Gates and [defendant] began to argue." Moore showed Pannell a photo array, and Pannell identified defendant as the shooter. At that time, Moore did not know anything about Pannell's pending court cases. Moore made no threats or promises to Pannell.

¶ 61 Moore testified that, prior to the shooting, he knew defendant but "didn't have any regular contact with him at all." Moore denied telling defendant that he was arresting defendant simply because he did not like him. Moore testified that he learned from checking the booking records from the night of the shooting that defendant had been booked for driving under the influence (DUI). He obtained the video of the DUI stop from the arresting officer's squad car camera. He had already obtained the surveillance footage from the shooting. He noticed that, during the DUI stop, defendant was dressed "virtually identically to the *** Richard's video" and that "it appeared to be the same person to me."

¶ 62                                    f. Video Evidence

¶ 63 The State played for the trial court the portions of the surveillance video and the DUI video that were played at trial.

¶ 64        The surveillance video depicted (1) the sidewalk in front of Club Pounders, (2) the northbound and southbound lanes of Main Street, and (3) the sidewalk and courthouse across the street from Club Pounders. The camera angle faced slightly northward because the camera was affixed to the right of the club. The camera depicted Gates and his two male companions walking to Gates's car, which was parked in front of the club facing southward toward Adams Street. Almost immediately after the trio arrived at Gates's car, the shooter appeared on the right side of the screen on foot, walking in the middle of the southbound lane of Main Street. The shooter approached within feet of Gates and his companions and had an apparent verbal exchange with the trio as he slowly walked past them. The verbal exchange continued for approximately 30 seconds as the shooter continued to slowly walk northbound past the tan Honda parked behind Gates's BMW. The shooter then disappeared from view on the left side of the video screen.

¶ 65        After the shooter disappeared from view, Gates and his companions loitered at Gates's parked car. After approximately 1½ minutes, the shooter reappeared on the left side of the screen and fired a gunshot. The gunshot was distinguishable by (1) a plume of smoke rising from where the shooter was standing and (2) Gates and his companions ducking and then running southbound. When the shooter fired the gun, he was standing on the Club Pounders side of Main Street, behind a light-colored car parked two cars directly behind Gates's car.

¶ 66        After Gates and his companions ran away, the shooter followed them, running between the sidewalk and parked cars on the club side of the street, firing additional shots in their direction. The shooter appeared within feet of the surveillance camera as he chased Gates and his companions, then disappeared out of view. The street was well-lit.

¶ 67                           g. The Trial Court's Ruling

¶ 68        In September 2022, the trial court issued an oral ruling denying defendant's

petition. The court stated the following:

> "The Court has *** considered the credibility, demeanor, and personality of the parties that have weighed in during this third-stage proceeding.
>
> * * *
>
> On November the 19th of 2021, we heard from Kenwaun Murray, who appeared in custody via video, and he testified that the witness, Nicholas Pannell, told him he lied because he had a deal with the State. This information came to light in approximately March of 2014.
>
> The Court did not find Mr. Murray's testimony particularly credible and his recall of specific facts [was] not particularly credible.
>
> On November 19th of 2021, Corey Hunter testified that he was there on the night of the shooting and it was not [defendant]. A very credible argument can be made that this testimony could have been known to the Defendant before and at the time of trial through the exercise of due diligence.
>
> Later, we heard from Mario Davis, who was outside of Pounders where the incident occurred, and he testified that the person was wearing an all black jacket and his skin was light not dark. The same argument can be made for Mr. Davis.
>
> [Defendant] testified and denied his involvement.
>
> Officer Tim Moore also testified via Zoom about the details of apprehending [defendant] and the DUI that occurred later in the early morning hours after the incident happened.
>
> In addition, the DVD of the incident was played that was a surveillance video, and the Court also reviewed the DUI arrest materials.

The court notes that [defendant's] stature, clothing, and hair length as seen on the video of [defendant's] DUI arrest were consistent with the individual that fired the shots as seen on the video.

The evidence that was presented during this third-stage hearing pursuant to instructions from the Third District Appellate Court cannot overcome the overwhelming evidence against defendant per [*People v. House*, 2014 IL App (3d) 130312-U], wherein the Third District noted that weight is to be given to the witness' credibility, resolution of inconsistencies, and reasonable inferences, and those are to be drawn by the trier of fact.

[Defendant] has not shown by a preponderance of the evidence the legal standard necessary for post-conviction relief, specifically third-stage proceedings, and they were not of such a conclusive character that would change the outcome of the retrial and the ultimate outcome would not be different."

¶ 69    This appeal followed.

¶ 70                                II. ANALYSIS

¶ 71    Defendant appeals, arguing that the trial court erred by denying his petition because he proved by a preponderance of the evidence that the testimony of the three witnesses who testified at the third-stage evidentiary hearing on defendant's actual innocence claim was newly discovered, material, noncumulative, and conclusive.

¶ 72    We disagree and affirm.

¶ 73                                A. The Act

¶ 74            1. *The Three Stages of a Postconviction Proceeding*

¶ 75    The Act provides a criminal defendant the means to redress substantial violations

of his constitutional rights that occurred in his original trial or sentencing. *People v. Robinson*, 2020 IL 123849, ¶ 42, 181 N.E.3d 37. "To be entitled to postconviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the challenged judgment." *People v. English*, 2013 IL 112890, ¶ 21, 987 N.E.2d 371.

¶ 76　　　　A postconviction proceeding operates in three stages. *Id.* ¶ 23. During the first stage, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Robinson*, 2020 IL 123849, ¶ 45. "In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.*

¶ 77　　　　If a defendant's petition survives the first stage, the proceedings advance to the second stage, where counsel may be appointed. *People v. Urzua*, 2023 IL 127789, ¶ 33. At the second stage, like the first stage, all well-pleaded facts that are not positively rebutted by the trial record are taken as true; the trial court does not engage in any fact-finding or credibility determinations. *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767 (quoting *People v. Coleman*, 183 Ill. 2d 366, 385, 701 N.E.2d 1063, 1073 (1998)). "The question raised in an appeal from an order dismissing a postconviction petition at the second stage is whether the allegations in the petition, liberally construed in favor of the [defendant] and taken as true, are sufficient to invoke relief under the Act." *People v. Sanders*, 2016 IL 118123, ¶ 31, 47 N.E.3d 237.

¶ 78　　　　At the third stage, unlike the first and second stages, the allegations are not taken as true; instead, "the trial court acts as a factfinder, making credibility determinations and weighing the evidence." *People v. Reed*, 2020 IL 124940, ¶ 51, 182 N.E.3d 64. A reviewing court will not reverse a trial court's findings regarding credibility determinations or fact finding after a third-stage evidentiary hearing unless the findings are manifestly erroneous. *Id.* "Manifest error is

'clearly evident, plain, and indisputable.' [Citation.] Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98, 996 N.E.2d 617 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155, 817 N.E.2d 524, 528 (2004)). This deferential standard of review reflects the understanding that the trial court is in the best position to observe and weigh the credibility of the witnesses. *Coleman*, 183 Ill. 2d at 384-85.

¶ 79                    2. *Postconviction Claims of Actual Innocence*

¶ 80        "As [the Illinois Supreme Court] stated in *Washington*, 'no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence.' " *Coleman*, 2013 IL 113307, ¶ 94 (quoting *People v. Washington*, 171 Ill. 2d 475, 489, 665 N.E.2d 1330, 1336-37 (1996)). "That statement indicates that the standard [the supreme court has] adopted is extraordinarily difficult to meet." *Id.*

¶ 81        "[I]n order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *Id.* ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Id.* "Material means the evidence is relevant and probative of the petitioner's innocence." *Id.* "Noncumulative means the evidence adds to what the jury heard." *Id.* "And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.*

¶ 82        If the trial court determines that the evidence presented at the evidentiary hearing was new, material, and noncumulative, "the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97. "This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.*

- 17 -

"Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 83                                                    B. This Case

¶ 84         The parties agree that defendant's postconviction evidence was material and noncumulative. The parties disagree, however, whether the evidence was new and conclusive. Because defendant bears the burden of presenting evidence that is (1) new, (2) material, (3) noncumulative, *and* (4) conclusive (*id.* ¶ 96), we need not determine whether the evidence was newly discovered because we affirm the trial court's judgment that the evidence was not conclusive.

¶ 85         Defendant argues that the trial court's decision was manifestly erroneous because the testimony of Murray, Hunter, and Davis would likely change the result on retrial. Specifically, defendant contends that his conviction rested solely on Pannell's testimony that he saw defendant firing the gunshots, and Murray's, Hunter's, and Davis's testimony contradicted and called into question Pannell's testimony. Defendant analogizes his case to *People v. Ortiz*, 235 Ill. 2d 319, 337, 919 N.E.2d 941, 952 (2009), and *Coleman*, 2013 IL 113307, ¶ 114, in which the Illinois Supreme Court awarded the defendants new trials because the newly discovered evidence conflicted with the trial evidence. Defendant asserts that his case is similar and he, too, should receive a new trial.

¶ 86         We disagree.

¶ 87                           1. *Appellate Review of Third-Stage Hearings*

¶ 88         This court, in *People v. Carter*, 2021 IL App (4th) 180581, ¶¶ 61-62, 188 N.E.3d 391, rejected the defendant's argument that he should receive a new trial because his case was factually similar to *Ortiz* and *Coleman*, writing as follows:

"The problem for defendant is that each one of those cases is *sui generis*, as are all third-stage postconviction proceedings. In the cases cited by defendant [(*Ortiz*, *Coleman*, and *People v. Molstad*, 101 Ill. 2d 128, 461 N.E.2d 398 (1984))], the supreme court determined, for various reasons, that the evidence presented at the evidentiary hearings was sufficient to merit a new trial. However, the only consistent takeaway from those cases is the legal standard that courts must apply when evaluating the evidence presented at third-stage proceedings in which a defendant has raised claims of actual innocence.

In such cases, the supreme court has consistently held that a new trial is warranted if the evidence is of such a character that it undermines confidence in the verdict. *Coleman*, 2013 IL 113307, ¶ 97. The court has explained that, after receiving evidence and hearing testimony, the trial court must evaluate the new evidence along with the trial evidence and weigh the probability of a different outcome upon retrial. Because trial courts must both (1) make credibility determinations and (2) consider the new evidence with the trial evidence, every case is fact intensive, unique, and to be considered on its own merits. Given the unpredictable nature of fact finding in general and juries in particular, comparing any given court opinion against the circumstances of a particular case before the trial court at a third-stage hearing is of minimal value, if any."

¶ 89    We further wrote in *Carter* that

"[a]ny time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our

deference to that court." *Id.* ¶ 68.

Such deference is due because trial courts acting as fact-finders rely heavily on the demeanor and paralanguage of the witnesses to assess their credibility—factors unavailable to a reviewing court, which has at its disposal only the transcript of a cold record.

¶ 90 In *People v. Hadden*, 2015 IL App (4th) 140226, ¶ 28, 44 N.E.3d 681, we explained in greater detail the concept of "paralanguage" when we wrote the following:

"Spoken language contains more communicative information than the mere words because spoken language contains 'paralanguage'—that is, the 'vocal signs perceptible to the human ear that are not actual words.' Keith A. Gorgos, *Lost in Transcription: Why the Video Record Is Actually Verbatim*, 57 Buff. L. Rev. 1057, 1107 (2009). Paralanguage includes 'quality of voice (shrill, smooth, shaky, gravely, whiny, giggling), variations in pitch, intonation, stress, emphasis, breathiness, volume, extent (how drawn out or clipped speech is), hesitations or silent pauses, filled pauses or speech fillers (e.g., "um/uhm," "hmm," "er"), the rate of speech, and extra-speech sounds such as hissing, shushing, whistling, and imitations sounds.' Gorgos, *supra*, at 1108. The information expressed through paralanguage is rarely included in the transcript, as there is generally no written counterpart for these features of speech. Gorgos, *supra*, at 1109."

¶ 91 In *Carter*, we reaffirmed what we wrote in *Hadden*, writing as follows:

"Paralanguage is critical to evaluating oral testimony, and we note that paralanguage is even more important when evaluating witnesses who are testifying from the witness stand than it is, as in *Hadden*, when evaluating a recording of what a witness said. When assessing credibility, a trial court is called upon to evaluate

- 20 -

everything together—visual (demeanor, body language), audio (tone), and the effect of the witness's testimony (*i.e.*, the impact a witness's testimony has upon the listeners)—which is an entirely different task than this court's when reviewing a cold record devoid of all of the crucial ways in which humans communicate in person, both verbally and nonverbally.

The old adage that it is not what one says but how one says it comes to mind. Identical words can have vastly different meanings based solely on the speaker's tone, body language, or both. And these factors may have a profound effect on a fact finder's evaluation of a speaker's credibility, believability, or trustworthiness. That is to say, a person's tone or body language can enhance or detract from his credibility. Judging whether someone is testifying truthfully, fully, honestly, and earnestly is nigh impossible from the mere words on a page." *Carter*, 2021 IL App (4th) 180581, ¶¶ 70-71.

¶ 92 We again reaffirm what we wrote about the importance of paralanguage in *Hadden* and *Carter* and consider it equally applicable here. Defendant contends that Murray's, Hunter's, and Davis's testimony was likely to have changed the result on retrial because it "directly refutes the State's evidence and calls Pannell's identification into question."

¶ 93 Defendant's argument ignores, however, the difference between the second and third stages of postconviction proceedings. At the second stage, the defendant need only allege evidence of his actual innocence and support his allegations with affidavits or other supporting documentation. At the third stage, the focus shifts to the quality and credibility of that alleged evidence, which is why the witnesses are required to testify in open court.

¶ 94 As we noted above, the primary purpose of a third-stage hearing is to test the

reliability, credibility, or veracity of the new evidence and determine whether the new evidence is compelling enough to place the trial evidence in a new light and undermine confidence in the finding of guilt. See *Coleman*, 2013 IL 113307, ¶¶ 96-97. These questions are determined by the trier of fact at the third-stage hearing. And in this case, the trial court, after observing the witnesses testify at the third-stage hearing, concluded that their testimony was not likely to change the result on retrial.

¶ 95          2. *The Trial Court's Credibility Findings Are Supported by the Record*

¶ 96          This court's job is to determine whether the trial court's conclusion that defendant's third-stage evidence was not conclusive was manifestly erroneous or, put another way, clearly and plainly wrong. In making that determination, we give deference to the trial court's credibility and factual findings. Having done so, we conclude that the trial court did not err because the record in this case supports the trial court's conclusion that the testimony of Murray, Hunter, and Davis was not of such a conclusive character that it would probably change the result on retrial. We address each witness's testimony in turn.

¶ 97                              a. Murray's Testimony

¶ 98          Regarding Murray, the trial court explicitly found his testimony to be not credible, noting in particular his inability to recall details. The court's finding is supported by the record.

¶ 99          Murray testified that he learned defendant was arrested in 2010 or 2011, but the shooting did not occur until 2012. Murray explained that his "recollection [was] kind of bad." He also could not identify the name of the gas station at which his conversation with Pannell occurred, or whether it occurred in February or March 2014.

¶ 100          If Murray were an uninterested party, his inability to recall these particular details might be easily excused due to the passage of time. However, Murray testified that he attended

defendant's sentencing hearing in April 2013. Under these circumstances, Murray's inability to recall the details of such an important conversation regarding defendant's criminal charges, with which Murray was clearly interested and involved, becomes harder to excuse.

¶ 101    The substance of Murray's testimony also supports the trial court's finding that it was not credible. First, it is unlikely that Pannell would make such a serious and self-incriminating confession to Murray, a person Pannell had encountered only once before during an altercation in a public space. Put another way, Murray was not Pannell's friend, and it is not believable that Pannell would openly confess to Murray that Pannell had framed Murray's friend for attempted murder.

¶ 102    Moreover, it is unlikely that Murray, upon receiving this information from Pannell, would simply leave and not immediately alert defendant. Murray's story that he just went home and only relayed Pannell's exonerating confession to defendant when defendant happened to call him in March 2014 strains credibility.

¶ 103    Additionally, Murray testified that he did not write his own affidavit; instead, it was mailed to him, he signed it, and he returned it. Last, Murray was testifying from the custody of IDOC for serious felony convictions. All of these factors cast substantial doubt on Murray's testimony and support the trial court's finding that his testimony was not credible.

¶ 104                    b. Hunter's and Davis's Testimony

¶ 105    The trial court did not make explicit credibility findings about Hunter's and Davis's testimony; however, the court was not required to make such findings. As we wrote in *Carter*, 2021 IL App (4th) 180581, ¶ 77, when considering all of the evidence, at the third stage, "the court is not required to make any explicit findings or discuss what evidence it found credible or not credible any more than it would be required to [do so] after conducting a bench trial." The

reviewing court's job is to "consider the record and determine if the trial court's ultimate determination is against the manifest weight of the evidence. *** Plainly stated, this court reviews the *totality* of the evidence underlying the trial court's judgment." (Emphasis in original.) *Id.* ¶ 78.

¶ 106          Here, the trial court concluded that Hunter's and Davis's testimony, taken together with Murray's testimony (which the court found to be not credible) and the trial testimony, was not of such conclusive character that it would likely change the result on retrial. The record amply supports the court's judgment.

¶ 107                                        i. *Hunter*

¶ 108          Hunter, like Murray, demonstrated poor recall of important details. For example, he testified that the shooting occurred "shortly after midnight," when it actually occurred at 1:19 a.m. He did not know the make or model of the car the shooter drove up in, stating that he "didn't really pay attention." When asked what clothing the shooter was wearing, Hunter answered, "Normal street wear. I cannot remember." When asked whether he remembered how many shots were fired, Hunter answered, "Not exactly." For each of these categories of questioning, Hunter offered additional information only when prompted by counsel through follow-up questions.

¶ 109          When the prosecutor attempted to follow up on Hunter's testimony regarding the shooter's clothing, Hunter demonstrated significant confusion about his own testimony he had just given on direct examination. Specifically, despite being asked only about the shooter's clothing on direct examination, Hunter became confused about whose clothing he had described. We point to the following exchange:

          "Q. [Defense counsel] asked you about his clothes. You said you weren't

          really paying attention. Can I take that to mean you don't know exactly?

          A. Well, you said—you asked me about whose clothes?

Q. Well, you tell me. Whose clothes were you talking about when he asked you?

A. That's what I'm asking you. You said 'his clothes.'

Q. Did you not know whose clothes he was talking about?

A. I don't recall. You're asking me—he asked me about multiple people.

Q. Okay. When you said you weren't really paying attention, whose clothes were you talking about? Do you remember?

A. The shooter?

Q. You tell me. Is that who you meant?

A. I mean, you going back to—you going back to questions—

Q. Yeah. You can't tell me—when you said you weren't really paying attention, you can't tell me whose clothes you were talking about?

A. Oh, you're talking about what [Pannell] was wearing?

Q. You tell me. You are the one who said you weren't paying attention. Whose clothes were you talking about? It happened moments ago. You just said it. Whose clothes were you talking about?

A. I been asked a lot of questions in between.

Q. You can't remember?

A. That's what I'm trying to ask you.

Q. Pardon me?

A. You're saying 'him.' I'm asking you who you are referring.

Q. I'm asking you who you mean by that. You said you weren't really paying attention when you were asked about someone's clothes. Whose clothes

- 25 -

were you talking about? It was not more than five minutes ago.

A. I've been asked a lot of questions in between—

Q. You can't remember?

A.—about different people.

Q. You don't know?

A. I don't recall.

Q. You don't recall who you were talking about when you said you weren't really paying attention?

A. Nope."

¶ 110 Hunter's question to the prosecutor whether he was talking about what Pannell was wearing is particularly confusing because Hunter had testified on direct examination that he did not see Pannell at the shooting.

¶ 111 Moreover, Hunter testified that, although he did not see Pannell at the shooting, he did see Gates with two other people. Given the overwhelming testimony that Pannell was present, the trial court could have easily found the selective identification unconvincing.

¶ 112 Most importantly, Hunter testified that he saw the shooter drive up in his car, get out and start shooting, and then drive away. Hunter's version of events is not supported by the surveillance video, which, as we have described, shows the shooter on foot, engaging with Gates, Pannell, and Binion for about 30 seconds as the shooter saunters past them, then reappearing on foot about a minute and a half later, when he begins firing the gun.

¶ 113                                        ii. *Davis*

¶ 114 Davis testified that he had consumed a few beers while at Club Pounders prior to the shooting and when asked if he had consumed any drugs, he did not answer directly. Instead,

he obliquely responded, "I smoke weed, but I don't—I mean, I don't be out of my mind." This simple exchange demonstrates both (1) an impaired ability to observe and recall and (2) a lack of candor.

¶ 115　　　　Moreover, Davis's affidavit stated the shooting occurred at 12:40 a.m., but at the hearing, he testified that the shooting took place between 1:30 and 2 a.m. When asked to explain the discrepancy, Davis stammered, "I don't—I don't recall. Like I said, it's been—it's been almost ten years, I believe, and I didn't—my—roughly, my mind—like, I haven't read what I wrote the last time. It's been a long time, so I—I could be mistaken. I could've made a mistake." When asked if Davis was mistaken at the time of his testimony or at the time of his affidavit, he answered, "Yeah, just—like, today my mind is, like—I have—I have my own—my problems right now, so I could just be—roughly, my mind is not—I'm just not using my mind, probably, correctly, which I apologize to the court, but—." Hearkening back to our discussion on paralanguage, Davis's stammering when confronted with the discrepancy reveals more than the mere discrepancy itself.

¶ 116　　　　Additionally, Davis's description of the preparation of his affidavit was highly questionable. For example, when the prosecutor inquired into the circumstances surrounding the creation of Davis's affidavit, the following exchange occurred:

> "Q. Can you describe for us, since you apparently are not too familiar with [defendant], who is it who approached you with the affidavit or who wrote that up for you? Who typed that out for you?
>
> A. Who typed this up for me?
>
> Q. Yeah.
>
> A. [Defendant] didn't type this up for me.
>
> Q. Okay. Who did?

A. My girlfriend did.

Q. Okay. Your girlfriend wrote that out?

A. Yes.

Q. Okay. And who approached you or your girlfriend to do that? What were the circumstances?

A. The word around town was that [defendant] got arrested for it. And all I was doing was just coming forth, and writing the affidavit, and getting—and getting the truth out, sir.

Q. Yeah. Well, the word around town you had just said was about two weeks after the incident; am I right?

A. Yes, sir.

Q. Okay. And so then it took you about two-plus years to have your girlfriend write up a couple sentences?

A. Yes, sir.

Q. Okay. And then where did you send that?

A. What do you mean where I sent this?

Q. Well, I have it, but I know you didn't send it to me. So after you signed it, where did it go from there? You had to give it to somebody.

A. To the courthouse.

Q. Where in the courthouse?

A. Circuit's [*sic*] Clerk.

Q. The circus clerk?

A. That's where this has came from, sir. I had them—

Q. Wait. I thought your girlfriend typed that up?

A. She typed it, I signed it, and we sent it to the courthouse. I don't know where they—they sent it to.

Q. Okay. But no one asked you to type that up—

A. No.

Q.—or your girlfriend?

A. No.

Q. You just—it occurred to you over two years later—

A. Yes

Q.—hey, we might as well write that up?

A. Yes.

Q. On that day, you particularly remember the time as being 12:40?

A. Yes. Yes.

\* \* \*

Q. All right. So, again, I just want to say no attorney ever asked your girlfriend or you to write up that affidavit and send it in?

A. No, sir.

Q. You just randomly sent it to the courthouse?

A. Yes, sir.

Q. To whom did you address it?

A. To whom I address—

Q. Yeah.

A. What do you mean?

Q. Well, if you mail something, don't you got to put on, like an envelope who it's going to? Have you ever mailed anything?

A. Circuit's [*sic*] Clerk, sir.

Q. Okay. Do you—did you put a case number on it? I don't know. You're still holding it. Do you have a case number on it?

A. Mmm-mmm. No.

Q. Okay. Let me take that back. Thank you. Who notarized it? There's a—was this stamp, this notary stamp, already on it when you signed it? You see right there?

A. What do you mean?

Q. Well, when you signed it, sir, was that stamp already on it?

A. No.

Q. Okay. Was there someone there who stamped it after you signed it?

A. What do you mean?

Q. Well, you signed it, your girlfriend typed it up for you, so I'm guessing both [of] you are there when you sign it, but maybe not. But was there a guy named John Bricker [(the name of the notary)] with you when you signed that?

A. No."

¶ 117    On redirect examination, the following exchange occurred between defense counsel and Davis:

Q. [Davis,] when [the prosecutor] questioned you about the affidavit that you wrote, you indicated that you don't know who John Bricker is, right?

A. Correct.

Q. But this affidavit was signed by you, right?

A. Yes, sir.

Q. And it was notarized?

A. Yes, sir.

Q. And the notary signed it and you're—I mean you were in the presence of the notary when you signed it?

A. Yes, sir."

¶ 118　On recross-examination, the following exchange occurred between the prosecutor and Davis:

"Q. Well, sir—so [defense counsel] just asked you if you signed it in the presence of a notary, so where did you sign it?

A. I signed it at home, sir.

Q. So that guy was at your [h]ouse?

A. Oh, you mean the notarized—

Q. Yeah.

A. No, I had a family member do it. I had a family member take me to get it notarized, so I didn't—

Q. Oh, all right. Where—where was that?

A. What does that matter?

Q. Don't—

THE COURT: If you know—

[THE PROSECUTOR]: Don't worry about it.

THE COURT:—you have to answer.

[DAVIS]: I went to—we went to a public library.

[THE PROSECUTOR]: Okay. Do you know which one?

A. Excuse me?

Q. Which—which library?

A. I can't remember."

¶ 119     Davis's testimony regarding the genesis and preparation of his affidavit can only be described as evasive, unclear, and highly suspect, casting doubt on his entire testimony.

¶ 120     In addition, Davis testified that he found out that defendant had been arrested for the shooting a week or two after the incident, yet Davis did not tell anyone that he saw the shooting and defendant was not the shooter. When asked why he did not go to the police, Davis answered, "I just didn't. I just didn't. I just didn't. There was no—I just didn't. I was scared of the police. I mean, I don't agree with—I don't know. I don't know." Davis's panicky, stuttering answer to a question asked *on direct examination by defense counsel* was far from compelling or convincing.

¶ 121                    3. *Defendant's Remaining Arguments*

¶ 122     Defendant also claims that the trial court's decision was manifestly erroneous because the court (1) failed to properly consider Hunter's and Davis's testimony as newly discovered, (2) misapprehended the evidence, (3) unreasonably concluded that the trial evidence was overwhelming, and (4) gave too much weight to the trial judge's assessment of the trial evidence. We address each argument in turn.

¶ 123                    a. Newly Discovered Evidence

¶ 124     Defendant first argues that, "[because] the [trial] court incorrectly concluded that Hunter and Davis's testimony did not satisfy the newly-discovered requirement for actual innocence claims," "it appears that the [trial] court did not consider Hunter and Davis's testimony

when deciding if [defendant's] new evidence was conclusive in character." We first note that the court did not conclude that Hunter's and Davis's testimony was not newly discovered. To the contrary, the court stated only that (1) "a credible argument [could] be made" that Hunter's testimony was not newly discovered and (2) "[t]he same argument [*could*] be made for Mr. Davis." (Emphasis added.) Defendant's argument is therefore based on a faulty premise.

¶ 125　　　　Moreover, his claim that the trial court did not properly consider the testimony in the court's conclusiveness analysis is pure speculation and unsupported by the record. As our earlier analysis shows, the court explicitly found that the totality of the evidence presented at the third-stage hearing was not of such a conclusive character as to probably change the result on retrial, and the court's finding was entirely appropriate.

¶ 126　　　　　　　　　　　　b. Misapprehension of the Evidence

¶ 127　　　　Defendant next argues that, even if the trial court considered Hunter's and Davis's testimony as part of its conclusiveness analysis, the court "misapprehended" Davis's testimony when the court stated that Davis testified the shooter was light complected when Davis actually testified that the shooter was dark complected. The record does not establish that the court's comment played a material role in its decision. Even if the court's ruling did materially rest on its belief that Davis testified the shooter was light complected, we have pointed out the numerous deficiencies with the remainder of Davis's testimony that support the court's conclusion that it was not credible. Accordingly, the court's misstatement was minor considering the totality of the evidence and does not render the court's ultimate decision manifestly erroneous.

¶ 128　　　　Defendant further argues that the trial court's conclusion that Murray's testimony was not credible is unsupported by the record. We have addressed that argument above (*supra* ¶¶ 97-103) and need not repeat our analysis here. However, defendant also claims that the State

did not present any evidence at the third-stage hearing that rebutted Murray's testimony. Defendant's argument is in error; it is well established that it is the *defendant's* burden to prove each element of an actual innocence claim. *Sanders*, 2016 IL 118123, ¶¶ 46-47.

¶ 129                                c. Overwhelming Trial Evidence

¶ 130          Next, defendant asserts that the trial court's finding that the State's trial evidence was "overwhelming" was unreasonable. Defendant contends that the only evidence supporting defendant's conviction was "a single eyewitness [(Pannell)] whose credibility was called into question at the [third-stage] evidentiary hearing." We disagree that Pannell's credibility was called into question by the testimony of the witnesses at the third-stage hearing.

¶ 131          We earlier identified numerous reasons why defendant's witnesses at the third-stage hearing lacked credibility. In addition, defendant's argument ignores the video evidence that played a significant role in defendant's conviction. Moore's testimony at the evidentiary hearing that, upon telling Pannell that Moore had obtained a video of the shooting, Pannell described a version of events that mirrored the video without ever seeing the video lends weight and credibility to Pannell's trial testimony.

¶ 132          Additionally, the surveillance video and DUI video were entered into evidence at both the postconviction hearing and the bench trial, which were conducted by different judges. The comments of each judge following that judge's respective hearing demonstrate that each made his or her own assessment of the videos and concluded that the videos established strong evidence of defendant's guilt. Namely, the postconviction court found that "[defendant's] stature, clothing, and hair length as seen on the video of [defendant's] DUI arrest were consistent with the individual that fired the shots as seen on the video." The judge at the bench trial found that the video evidence "identifies [the] stature of the individual in both videos, the clothing worn, the marking on the

- 34 -

respective clothing, the hat, length of hair, all of which are, to the Court's conclusion, satisfactory proof beyond a reasonable doubt that [defendant] indeed was the shooter." Having viewed the videos, we discern no error in their findings.

¶ 133     Even if we disagreed with the trial court's characterization of the evidence as "overwhelming," the trial evidence, when considered with the third-stage postconviction evidence, was certainly strong enough for us to conclude that the court's ultimate decision was not manifestly erroneous.

¶ 134          d. Weight Given to the Findings From the Original Bench Trial

¶ 135     Last, defendant argues that the "the [trial] court should not have given any deference to the trial judge's assessment of the trial evidence when deciding if [defendant's] new evidence was conclusive in character." Defendant points to the following comments the court made when it issued its ruling denying defendant's petition at the third stage:

> "The evidence that was presented during this third-stage hearing pursuant to instructions from the Third District Appellate Court cannot overcome the overwhelming evidence against defendant per [*People v. House*, 2014 IL App (3d) 130312-U], wherein the Third District noted that weight is to be given to the witness' credibility, resolution of inconsistencies, and reasonable inferences, and those are to be drawn by the trier of fact."

¶ 136     We disagree with defendant that the above comments constitute the trial court's giving deference to the trial judge's assessment of the trial evidence. Although the court's comments are far from a model of clarity, we discern the court's comments to reflect (1) the court's own assessment that the trial evidence was overwhelming and (2) a reference to the Third District's instruction that issues of weight and credibility are to be determined by the trier of fact. Indeed,

we conclude that the trial court's comments never refer to the trial judge and instead recognize the court's own responsibility as the trier of fact at the third-stage hearing to make factual determinations and credibility findings.

¶ 137　　　　　For all of the above reasons, we disagree that the trial court's decision that defendant's evidence was not conclusive was manifestly erroneous.

¶ 138　　　　　　　　　　　　III. CONCLUSION

¶ 139　　　　　For the reasons stated, the judgment of the trial court is affirmed.

¶ 140　　　　　Affirmed.

*People v. House*, **2023 IL App (4th) 220891**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 12-CF-254; the Hon. Katherine S. Gorman, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Cristina Law Merriman, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and Connor Goetten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |