THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES FIELDS, Defendant-Appellant.

First District (4th Division)   No. 1—93—1028

Opinion filed December 26, 1996.—Rehearing denied February 7, 1997.

Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Tyra Taylor-Bell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, James Fields, was convicted of two counts of first-degree murder (720 ILCS 5/9—1(a)(1) (West 1992)) and sentenced to two terms of natural life imprisonment without parole. On appeal, defendant asserts that (1) he was denied a fair trial by the State's improper use of out-of-court statements; (2) the trial court impermissibly hastened the verdict by telling the jurors that their transportation was waiting; and (3) he was not proven guilty beyond a reasonable doubt. For the following reasons, we affirm.

On June 8, 1991, Willie Range, James Campbell, and Andrew Rudolph lived with Barbara Wiley, who was Range's sister, at 439 E. 111th Place in Chicago. When Wiley left the apartment at 10 p.m., Range, Campbell, and Charlie Stewart, a friend, were there. When she returned home at 2 a.m., she learned that Range and Campbell had been fatally shot. At 2:25 a.m., Chicago police officer William Peak discovered the bodies on the apartment's dining room floor. They were still bleeding.

Dr. Mitra Kalelkar, the assistant Cook County medical examiner who performed the autopsies, testified that each of the victims was killed by a single gunshot wound to the head, fired from close range, but the bullets she retrieved from the victims were unsuitable for calibration.

Andrew Rudolph testified that he was asleep in the apartment at 1:30 a.m. on June 9, 1991, when he was awakened by two gunshots. He looked around the apartment and saw two dead people, whom he "did not really" recognize. No one else was in the apartment, so he got up and left.

Rudolph stated that he gave an oral statement at the police station. In that statement, he told the police that he was sleeping on the couch when he was awakened by two gunshots. He looked up and saw defendant standing in the dining room. Defendant looked directly in his face, then walked out of the apartment and down the street. Range and Campbell had been shot and were lying on the dining room floor. Rudolph denied telling the police that defendant's arm was pointing downward toward Range.

Rudolph further testified that he signed a written statement prepared by Assistant State's Attorney Daniel Lynch. He admitted that he told Lynch that he was sleeping on the living room couch at 1:15 a.m. on June 9, 1991, but denied saying that Janice White woke him, asking him to sell her rock cocaine. He also denied telling Lynch that he lay back down after the conversation, but could not fall asleep because a lot of people were talking in the apartment and the television, lights, and fan were on.

Rudolph admitted that he told Lynch he was awakened by the first gunshot and he heard a second gunshot three seconds later. Defendant, who was standing in the dining room, turned toward Rudolph, looked at him, began to walk toward him, then turned and left the apartment. Rudolph got up, saw that Range and Campbell had been shot, and smelled the gunpowder. He did not see any weapons near the bodies or in the hands of the victims. After leaving the apartment, he saw defendant get into a car and drive away. Rudolph denied telling Lynch that no one else was in the apartment at the time of the shooting or that defendant drove away within a minute of the shooting.

In addition, Rudolph stated that he told the grand jury on June 10, 1991, that Range, Campbell, and Stewart were in the apartment when he returned at 12:15 a.m. on June 9, 1991. His grand jury testimony was substantially the same as his written statement to Lynch. At trial, Rudolph made the same admissions and denials about his grand jury testimony as he had about his written statement.

According to Rudolph, he was intoxicated and high on marijuana at the time of the shootings and when he made his statements at the police station. He claimed that he gave his out-of-court statements, which were composed by the police, because the police threatened several times to charge him as an accessory to murder. Rudolph also stated that he read only part of the written statement before signing it.

Detective Jack Hines testified that he spoke with Rudolph at 7 a.m. on June 9, 1991, in the police station. Rudolph said that he saw

defendant in the apartment and that defendant's arm was pointing downward toward Range, who had been shot and was lying under the table. Defendant looked at Rudolph, then walked out of the apartment. After Rudolph saw both victims shot on the dining room floor, he went outside, where he saw defendant get into a car and drive away. According to Hines, there was no indication that Rudolph was intoxicated or high on drugs when he gave his statement. Hines denied threatening Rudolph with charges or mistreating him in any way.

After Assistant State's Attorney Lynch testified that he took a written statement from Rudolph on June 9, 1991, over objection, he read the entire statement to the jury. Assistant State's Attorney Nancy Black, over objection, read Rudolph's entire grand jury testimony to the jury after she testified that Rudolph did not complain about any mistreatment by the police prior to the grand jury hearing.

Alesha Parks, who has a child with defendant, testified that she had been dating defendant for a year prior to the early morning hours of June 9, 1991, when she and defendant walked to 439 E. 111th Place. After Janice White, Range, and another woman let them into the building, White and defendant had a conversation, but Parks could not hear what was being said. When White, Range, and the other woman went upstairs to a second-floor apartment, Parks and defendant remained on the first floor. Parks denied that she saw defendant take a gun out of his waistband and put it on a ledge or unscrew the light bulbs. A short time later, White reappeared. Parks testified that White did not come downstairs to talk with defendant, but instead, stayed on the second floor and summoned him. When defendant went upstairs, Parks left to get a jacket and did not return to the building.

Parks gave a written statement to Assistant State's Attorney Lynch, in which she stated that defendant came to her house at 12:40 a.m. on June 9, 1991, and asked her to go to a motel to have sex. She did not remember saying that she told defendant her mother would not allow her to leave the front of the house, but she did tell Lynch that they took a walk to 439 E. 111th Place. Once they were inside the vestibule, Parks saw defendant take a gun out of his waistband and put it on the steps. A short time later, White, Range, and another woman came into the building and went upstairs while Parks and defendant continued to talk on the first floor. Later, White came downstairs and told them that they could get comfortable in the room upstairs, but it would cost a rock of crack cocaine.

Defendant and White went into the second-floor apartment while

Parks waited in the hallway. She heard White and defendant arguing with Range, who wanted an extra rock of crack for himself. Defendant came out to the hallway and said that "they were trying to play him" and "he should go and kill all four of them." After White came out and told defendant that she would get some crack from Rudolph, defendant went into the kitchen with White, Range, and Campbell while Parks sat on the living room couch.

Campbell reappeared from the kitchen with a plate of noodles and sat down at the dining room table, but Range and defendant continued to argue in the kitchen. After White and the other woman left, Range told Parks to leave. Parks denied that defendant walked her downstairs before he returned to the apartment to use the washroom. She testified that she told Lynch that defendant, Range, Campbell, and Rudolph were the only people in the apartment when she left. Two minutes later, as Parks was walking on the street, she heard two loud gunshots and then saw defendant come out of the building. He had a gun, which he put in his waistband. He walked over to two men, Snake and Jimmy, and said, "I shot him. Come on. He's dead," then got into a car and drove away.

According to Parks, her prior statements at the police station and to the grand jury were coerced. When she returned home from the police station, she told her parents that she had given a false statement. They told her to tell the truth to the grand jury, but when Parks met with Assistant State's Attorney Black prior to the grand jury hearing, she reluctantly agreed to testify in conformance with her statements at the police station.

Parks told the grand jury that she had been dating defendant on and off for three years when he came to her house in the early morning hours of June 9, 1991, and asked her to take a ride. She told him that her mother would not allow her to leave the block, so they walked to 439 E. 111th Place. When they entered the vestibule, defendant unscrewed the light bulbs, then pulled a revolver out of his waistband and put it on the ledge. Shortly afterwards, White, Range, and a woman named Annette came into the building. White hugged defendant, then sat on the ledge to talk. Defendant tried to shield the gun with his arm.

When White, Range, and Annette went upstairs, White asked defendant if he wanted privacy. He told her "no" and stayed with Parks on the first floor. Two minutes later, he went to the second floor and knocked on the apartment door. White told him that it would cost him some cocaine or $10 for a room. When he told her he had neither, White and defendant went to talk to Range while Parks stood near the bathroom door. Parks could hear Range and defendant arguing.

Shortly afterwards, defendant and Parks went into the hallway, where defendant said that the people inside were begging for cocaine and that "he should go in there and shoot all four of them, and maybe they have a better life." White reappeared and told defendant that Rudolph, who was sleeping on the couch, had some cocaine. Defendant went back into the kitchen while Parks sat on the couch. She could hear him arguing with Range and Campbell, then saw Campbell come into the dining room with a bowl and start eating.

After White and Annette left, Range told Parks to leave. As she was leaving, she overheard defendant remind Range that he used to sell drugs to Range's brother. She did not see anyone with a gun in the apartment, but shortly after she left the building, she heard two gunshots, then saw defendant coming down the street. He put a gun in his waistband, then told Jimmy and Snake that he "just shot him, they're dead." Defendant got into a car and left.

Assistant State's Attorney Lynch read Parks's written statement to the jury in its entirety, and Assistant State's Attorney Black testified about the circumstances surrounding Parks's grand jury testimony, but he did not read it to the jury.

Defendant presented the testimony of Parks's parents, who testified about the police taking their daughter and questioning her at the police station. Mrs. Parks stated that her daughter told her she was forced to make a false statement to the police.

After the close of testimony, at 6:45 p.m., the defense counsel objected to closing arguments being heard before the next morning. The trial court asked the jurors whether they wanted to continue that evening. Because they answered affirmatively, the closing arguments were heard and the jury began its deliberations at 8:26 p.m. over the defense's objection. At 10:45 or 10:46 p.m., the trial judge informed the parties he had earlier told the deputy sheriff to tell the jurors at 10:45 p.m. that transportation was waiting to take them to their hotel accommodations. When the sheriff did so, the jurors asked if they could have another 10, 15, or 20 minutes. While the defense attorney was making his objections, at 10:50 p.m., the jury rang the buzzer to indicate that it had reached a verdict. The jury was brought into the courtroom, but the sheriff informed the court that one of the jurors was upset in the restroom. The jury was taken back to the jury room and returned 30 seconds later with all the jurors present.

Defendant was convicted of the first-degree murders of Range and Campbell. Subsequently, the trial court found that defendant was eligible for the death penalty but that sufficient mitigating factors precluded him from being sentenced to death. Instead, he was sentenced to two terms of natural life imprisonment without parole.

■ The first issue is whether the State improperly used the prior inconsistent statements by Andrew Rudolph and Alesha Parks, which were admitted as substantive evidence under section 115—10.1 of the Code of Criminal Procedure of 1963:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." 725 ILCS 5/115—10.1 (West 1992).

Although defendant agrees that the out-of-court statements by Rudolph and Parks met the requirements of section 115—10.1 to the extent that they were inconsistent with the trial testimony, he asserts that he was denied a fair trial because the State unnecessarily repeated several times the substance of the entire statements to the jury in an attempt to prove that they were true. He further argues that the cumulative and repetitive testimony elicited by the State improperly bolstered the credibility of the out-of-court statements and only the inconsistent portions of his prior statements should have been admitted at trial.

A court does not have to make a "quantitative or mathematical analysis" of whether a witness's entire statement is inconsistent" for the entire statement to be admissible. *People v. Salazar*, 126 Ill. 2d 424, 456-58, 535 N.E.2d 766 (1988); *People v. Morales*, 281 Ill. App. 3d 695, 701, 666 N.E.2d 839 (1996). Instead, the trial court has the discretion to determine whether or not the testimony is admissible. *Salazar*, 126 Ill. 2d at 457; *Morales*, 281 Ill. App. 3d at 701.

■ We find that the out-of-court statements by Rudolph and Parks

were sufficiently inconsistent that the trial court did not abuse its discretion in allowing the entire statements to be admitted into evidence. Further, we do not think that the repetitive testimony prejudiced defendant. However, the testimony was unnecessarily repetitive, and we caution the State to refrain from needless repetition of a witness's prior inconsistent statements.

■ Defendant's next assertion is that Parks's prior statements contained inadmissible details that were designed solely to portray him unfavorably before the jury. Specifically, defendant complains that the testimony about his prior drug sales was highly prejudicial other crimes evidence and that the testimony about his sex life with Parks, who was 17 years old, was intended solely to portray him as an immoral person.

Although the evidence of defendant's prior drug sales was irrelevant other crimes evidence (*People v. Gilliam*, 172 Ill. 2d 484, 514 (1996); *People v. Williams*, 165 Ill. 2d 51, 61, 649 N.E.2d 397 (1995)), we find the error to have been harmless. Reversal is not required where the record affirmatively shows that the error was not prejudicial. *People v. Richardson*, 123 Ill. 2d 322, 342, 528 N.E.2d 612 (1988).

■ As to the evidence of defendant's negotiations with White, Range, and Campbell for the use of a room, that evidence was proper evidence of defendant's motive for the shooting. *People v. Jones*, 156 Ill. 2d 225, 239, 620 N.E.2d 325 (1993).

■ Next, defendant argues that Parks's written statement regarding his confession to Snake and Jimmy was inadmissible under section 115—10.1(c)(2) because it was beyond her personal knowledge. Parks stated that after defendant came out of the building, he told Snake and Jimmy that he had shot the victims.

Although Parks's grand jury testimony about defendant's confession was admissible under section 115—10.1(c)(1), her written statement would be admissible under section 115—10.1(c)(2)(A) only if it was within her personal knowledge. *Morales*, 281 Ill. App. 3d at 700; *People v. Hastings*, 161 Ill. App. 3d 714, 719, 515 N.E.2d 260 (1987). The personal knowledge requirement limits the use of out-of-court statements to those events the witness actually observed. *Morales*, 281 Ill. App. 3d at 700; *People v. Cooper*, 188 Ill. App. 3d 971, 973, 544 N.E.2d 1273 (1989). Because Parks had no personal knowledge that defendant had shot Range and Campbell, it was improper to admit her written statement regarding defendant's confession into evidence. However, the admission of her statement was harmless error. In contrast, the admission of her statement that, after she heard two gunshots, she saw defendant come out of the building with a gun and put it in his waistband was proper.

Defendant further asserts that he was prejudiced by the trial court's statement to the jury during deliberations that transportation was waiting to take it to the hotel. We disagree.

■ In determining the propriety of the trial court's comments to the jury, the test is whether, upon examination of the totality of circumstances, the language used actually interfered with the jury's deliberations and coerced a guilty verdict. *People v. Defyn*, 222 Ill. App. 3d 504, 515-16, 584 N.E.2d 220 (1991); *People v. Ferro*, 195 Ill. App. 3d 282, 292, 551 N.E.2d 1378 (1990); *People v. Branch*, 123 Ill. App. 3d 245, 251, 462 N.E.2d 868 (1984). Since coercion is a highly subjective concept that does not lend itself to precise definition or testing, the reviewing court's decision often turns on the difficult task of ascertaining whether the challenged comments imposed such pressure on the minority jurors that it caused them to defer to the conclusions of the majority for the purpose of expediting a verdict. *Branch*, 123 Ill. App. 3d at 251. Although the length of deliberations following a trial court's comments is relevant to the issue of coercion, informing a jury that it will be sequestered after a certain time is not necessarily coercive. *Ferro*, 195 Ill. App. 3d at 292; *Branch*, 123 Ill. App. 3d at 252.

■ There is no evidence that the jury was pressured in any way when it was informed that transportation was waiting. This case differs from those cases where the trial court gave the jury a deadline (see *Ferro*, 195 Ill. App. 3d 282, 551 N.E.2d 1378; *People v. Friedman*, 144 Ill. App. 3d 895, 494 N.E.2d 760 (1986); *Branch*, 123 Ill. App. 3d 245, 462 N.E.2d 868) and is similar to those cases where the jury requested more time to deliberate (see *People v. Steidl*, 142 Ill. 2d 204, 568 N.E.2d 837 (1991); *People v. Nemecek*, 277 Ill. App. 3d 243, 660 N.E.2d 133 (1995); *Defyn*, 222 Ill. App. 3d 504, 584 N.E.2d 220).

In the case of *People v. Friedman*, 144 Ill. App. 3d 895, 494 N.E.2d 760 (1986), the jury retired to deliberate in the late afternoon. At 7 p.m., the jury requested a transcript of the trial. When the court informed the jury that no transcript was available, the jury returned to the jury room. At 9 p.m., the jury inquired about the meaning of "unauthorized control over merchandise." The court orally answered the question and then stated:

> "As long as you're out here I will tell you that in about half an hour we have to arrange overnight accommodations for you, which we do very often, and then you would be back here tomorrow morning. So in the meantime, that will be in about 45 minutes probably. So you may return to the jury room." *Freidman*, 144 Ill. App. 3d at 903.

The jury returned guilty verdicts five minutes later. The court in

*Friedman* held that the court's comment impermissibly hastened the verdict.

In the case *sub judice*, the jury had no questions regarding the evidence or the jury instructions, as in *Friedman*, nor did the court give it a deadline to decide whether overnight accommodations would or would not be necessary. The court in this case did not grant the jury additional time to deliberate. The request for additional time came from the jury. In this case, at 6:45 p.m., the jury chose not to wait until the next morning to hear the closing arguments and begin deliberations. At 10:45 p.m., when the jury was informed that transportation was waiting, the jury requested that it be given another 10, 15, or 20 minutes to deliberate. We do not believe that the holding in *Friedman* is applicable to this case.

We conclude that the trial court's actions were not coercive and did not interfere with the jury's deliberations. At 10:45 p.m., the deputy sheriff, under the trial court's direction, informed the jury that transportation was waiting to take it to the hotel. The jury was not given a deadline. Instead, it asked for another 10, 15, or 20 minutes, and returned a guilty verdict five minutes later, before it got an answer from the trial court. Although one juror was upset in the bathroom and did not initially return to the courtroom with the jury, there was no evidence that this was caused by any feeling of being coerced. After the jury was taken back to the jury room, it returned 30 seconds later with all the jurors present. The totality of circumstances indicates that the trial court's actions did not interfere with the jury's deliberations or coerce a guilty verdict.

■ Defendant's final assertion is that he was not proven guilty beyond a reasonable doubt because the only evidence linking him to the murders was the prior inconsistent statements of Rudolph and Parks, which contradicted each other in critical ways, were severely impeached by their trial testimony, and did not significantly implicate him in the shootings. We disagree.

The inconsistencies in this case were not so improbable or unsatisfactory that they created a reasonable doubt as to defendant's guilt. *Gilliam*, 172 Ill. 2d at 515; *Steidl*, 142 Ill. 2d at 226. Instead, they affected the witnesses' credibility, which is best left to the jury to evaluate. Determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. *People v. Enis*, 163 Ill. 2d 367, 393, 645 N.E.2d 856 (1994); *Steidl*, 142 Ill. 2d at 226. Considering all the evidence in this case in the light most favorable to the prosecution, a rational juror could have found the essential elements of first-degree murder beyond a reasonable

doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *Gilliam,* 172 Ill. 2d at 515; *People v. Rivera,* 166 Ill. 2d 279, 287, 652 N.E.2d 307 (1995). Therefore, we conclude that there was sufficient evidence to find defendant guilty of both murders beyond a reasonable doubt.

Based on the foregoing, we affirm the circuit court's judgment.

Affirmed.

TULLY, P.J., and GALLAGHER, J., concur.