2024 IL App (1st) 221421-U

No. 1-22-1421

Order filed July 3, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 91 CR 2046701 |
| | ) | |
| JAMES FIELDS, | ) | Honorable |
| | ) | Lawrence Flood, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices C.A. Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Trial court's denial of defendant's successive postconviction petition after a third-stage evidentiary hearing was not manifestly erroneous where the evidence presented was not of such a conclusive nature that it would probably change the result on retrial nor was it newly discovered evidence based on additional facts elicited from the testimony at the evidentiary hearing. Additionally, the trial court did not err in excluding from consideration the affidavits this court previously determined were not newly discovered evidence and were thus outside of the mandate for purposes of the remand for a third-stage evidentiary hearing based on newly discovered evidence.

¶ 2 This case is before us again after a May 2021 remand for a third-stage evidentiary hearing on defendant James Fields' successive postconviction petition which alleged actual innocence based on newly discovered evidence. *People v.* Fields, 2021 IL App (1st) 191712-U, ¶ 90. Specifically, we found that the affidavit of Celeste Brown was newly discovered evidence that was material and noncumulative to support defendant's substantial showing of an actual innocence claim. *Id.* ¶ 88. After the third-stage evidentiary hearing, the trial court denied defendant's postconviction petition, finding that Brown's testimony, though credible and material, were not of such a conclusive nature that it would probably change the result on retrial when balanced with the trial evidence.

¶ 3 Defendant appeals, contending that (1) he met the burden of establishing actual innocence and should receive a new trial, and (2) the trial court erred in refusing to consider the affidavits of James Hopkins and Thomas London at the evidentiary hearing. For the reasons that follow, we affirm.

¶ 4 BACKGROUND

¶ 5 A. Procedural Background

¶ 6 The procedural background of this case, up to our remand, is taken from our May 2021 disposition.

¶ 7 Following a jury trial, defendant was found guilty of two counts of first degree murder for the shooting deaths of Willie Range (Range) and James Campbell (Campbell) and was sentenced to two terms of natural life imprisonment without parole. His conviction and sentence were affirmed on direct appeal. *People v. Fields*, 285 Ill. App. 3d 1020 (1996). On June 30, 1998, defendant filed his initial postconviction petition. That petition was summarily dismissed on July

17, 1998, and defendant appealed. Appellate counsel filed a motion for leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). On September 30, 1999, this court granted the motion to withdraw and affirmed the convictions on direct appeal. *People v. Fields*, No. 1-98-3369 (1999) (unpublished order under Supreme Court Rule 23). Our supreme court denied defendant leave to appeal on May 31, 2000. *People v. Fields*, 189 Ill. 2d 666 (2000).

¶ 8　　On May 7, 1999, prior to this court's decision in his initial postconviction appeal, defendant filed a second postconviction petition, which was summarily dismissed.[1] Defendant appealed, and appellate counsel filed a motion requesting leave to withdraw pursuant to *Finley*, and this court granted the motion. *People v. Fields*, No. 1-99-2397 (2000) (unpublished order under Supreme Court Rule 23). Defendant was again denied leave to appeal by our supreme court on October 2, 2000. *People v. Fields*, 191 Ill. 2d 542 (2000).

¶ 9　　On June 5, 2018, defendant sought leave to file a second successive postconviction petition alleging actual innocence based on newly discovered evidence. The motion was granted and the petition proceeded to the second stage. On January 14, 2019, the State filed a motion to dismiss, which the trial court granted on July 24, 2019. Defendant appealed, contending that the postconviction court erroneously dismissed his petition when it concluded that the affidavits of defendant, Alesha Parks, Andrew Rudolph, Thomas London, Celeste Brown, and James Hopkins were not newly discovered evidence. Defendant contended that his petition made the requisite showing to warrant an evidentiary hearing. We found that all of the affidavits except Brown's were not newly discovered evidence. We concluded that Brown's affidavit was newly discovered and

---

[1] There is no date provided in the record as to when it was dismissed.

reversed and remanded for a third stage evidentiary hearing based on that newly discovered evidence. *People v. Fields*, 2021 IL App (1st) 191712-U, ¶¶ 88, 90.

¶ 10                                B. Trial Evidence

¶ 11     The following evidence was presented at defendant's trial as set forth in defendant's direct appeal (*People v. Fields*, 285 Ill. App. 3d 1020 (1996)) and the trial record. On June 9, 1991, Range and Campbell (victims) were shot and killed at 439 East 111th Place in Chicago. *Id.* at 1022. The victims and Andrew Rudolph lived with Barbara Wiley, who was Range's sister. *Id*. When Wiley left the apartment at 10 p.m., Range, Campbell, and another friend, Charlie Stewart, were there. *Id*. Upon returning at 2 a.m., Wiley learned that the decedents were fatally shot, the police arrived at 2:25 a.m. and the bodies were still bleeding on the dining room floor. *Id.* The medical examiner testified that each victim was killed by a single gunshot wound to the head, fired from close range. *Id*.

¶ 12     Rudolph testified that he was asleep in the apartment at 1:30 a.m. on June 9, 1991, when he was awakened by two gunshots. *Id*. He looked around the apartment and saw two dead bodies, whom he testified that he did not really recognize. *Id.* 1022-23. Rudolph stated that no one else was in the apartment, so he left. *Id*. at 1023. He testified that he previously gave an oral statement at the police station, where he told the police that he was sleeping on the couch in the living room when he was awakened by two gunshots and saw defendant standing in the dining room. *Id*. Defendant looked directly in his face, then walked out of the apartment and down the street. *Id*. Rudolph stated that the victims had been shot and were lying on the dining room floor. *Id.* He denied telling the police that defendant's arm was pointing downward towards Range. *Id.*

¶ 13    Rudolph also testified that he signed a written statement prepared by Assistant State's Attorney (ASA) Lynch. *Id.* He admitted that he told ASA Lynch that he was sleeping on the living room couch at 1:15 a.m. on June 9, 1991, but denied saying that Janice White woke him asking him to sell her rock cocaine. *Id.* Rudolph also denied telling ASA Lynch that he laid back down after the conversation, but could not fall asleep because a lot of people were talking in the apartment and the television, lights and fan were on. *Id.* He admitted that he told ASA Lynch that he was awakened by the first gunshot and he heard a second gunshot three seconds later. *Id.* Defendant, who was standing in the dining room, turned toward Rudolph, looked at him and began to walk toward him before he turned and left the apartment. *Id.* Rudolph got up, saw that the victims had been shot and smelled the gunpowder, but did not see any weapons near the bodies or in the hands of the victims. *Id.* After leaving the apartment, Rudolph saw defendant get into a car and drive away. *Id.* He denied telling ASA Lynch that no one else was in the apartment at the time of the shooting or that defendant drove away within a minute after the shooting. *Id.*

¶ 14    Rudolph additionally testified that he told the grand jury on June 10, 1991, that the victims and Stewart were in the apartment when he returned at 12:15 a.m. on June 9, 1991. *Id.* His grand jury testimony was substantially the same as his written statement to ASA Lynch. *Id.* At trial, Rudolph made the same admissions and denials about his grand jury testimony as he had about his written statement, namely that he was intoxicated and high on marijuana at the time of the shootings and when he made his statements at the police station. *Id.* He testified that he gave his out-of-court statements, which were composed by the police, because the police threatened several times to charge him as an accessory to murder, and that he read only part of the written statement before signing it. *Id.*

¶ 15    Detective Hines testified that he spoke with Rudolph at 7 a.m. on June 9, 1991, at the police station. *Id.* Rudolph told him that he saw defendant in the apartment and defendant's arm was pointing downward toward Range, who had been shot and was lying under the table. *Id.* at 1024. Defendant looked at Rudolph before walking out of the apartment. *Id.* After Rudolph saw both victims, he went outside and saw defendant get into a car and drive away. *Id.* Hines testified that there was no indication that Rudolph was intoxicated or high on drugs when he gave his statements, and he denied threatening Rudolph with charges or mistreating him. *Id.*

¶ 16    After ASA Lynch testified that he had a written statement from Rudolph on June 9, 1991, over the defense's objection, he read the entire statement to the jury. *Id.* Similarly, ASA Black read Rudolph's entire grand jury statement to the jury over the defense's objection after her testimony that Rudolph did not complain about any mistreatment by police prior to the grand jury hearing. *Id.*

¶ 17    Parks, who has a child with defendant, testified that she dated defendant for a year prior to the early morning hours of June 9, 1991, when she and defendant walked to 439 East 111th Place. *Id*. After White, Range, and another woman let them into the building, White and defendant had a conversation, but Parks could not hear what was being said. *Id*. When White, Range, and the other woman went upstairs to a second-floor apartment, Parks and defendant remained on the first floor. *Id*. Parks denied that she saw defendant take a gun out of his waistband and put it on a ledge and unscrew the lightbulbs. *Id*. White reappeared shortly thereafter, but did not come downstairs to talk to defendant. *Id*. Instead, White stayed on the second floor and summoned him. *Id*. When defendant went upstairs, Parks left to get a jacket and did not return to the building. *Id*.

¶ 18 Parks previously gave a written statement to ASA Lynch in which she stated that defendant came to her house at 12:40 a.m. on June 9, 1991, and asked her to go to a motel to have sex. *Id.* She did not remember saying that she told defendant that her mother would not let her leave the front of the house, but she did tell ASA Lynch that they walked to 439 East 111th Place and once inside the vestibule, Parks saw defendant take a gun out of his waistband and put it on the steps. *Id.* Shortly thereafter, White, Range, and another woman came into the building and went upstairs while Parks and defendant continued to talk on the first floor. *Id.* White then came downstairs and told them that they could get comfortable in the room upstairs, but it would cost a rock of crack cocaine. *Id.*

¶ 19 Defendant and White went into the second floor apartment while Parks waited in the hallway. *Id.* at 1024-25. Parks heard White and defendant arguing with Range, who wanted an extra rock of crack for himself. *Id.* at 1025. Defendant came out to the hallway and told Parks that "they were trying to play him" and "he should go and kill all four of them." *Id.* After White came out and told defendant that she would get some crack from Rudolph, defendant went into the kitchen with White, Range, and Campbell, while Parks sat on the living room couch. *Id.*

¶ 20 Campbell left the kitchen sat down at the dining room table to eat, but Range and defendant continued to argue in the kitchen. *Id.* After White and the other woman left, Range told Parks to leave. *Id.* Parks denied that defendant walked her downstairs before he returned to the apartment to use the bathroom. *Id.* She testified that she told ASA Lynch that defendant, Range, Campbell, and Rudolph were the only people in the apartment when she left. *Id.* Two minutes later, as Parks was walking on the street, she heard two loud gunshots and then saw defendant come out of the building. *Id.* Defendant had a gun, which he put in his waistband. *Id.* Defendant walked over to

two men, Snake and Jimmy, and said, "I shot him. Come on. He's dead," then he got into a car and drove away. *Id.*

¶ 21 At trial, however, Parks testified that her prior statements at the police station and to the grand jury were coerced. *Id.* When she returned home from the police station, she told her parents that she had given a false statement. *Id.* They told her to tell the truth to the grand jury, but when Parks met with ASA Black prior to the grand jury hearing, she reluctantly agreed to testify in conformance with her statements at the police station. *Id.*

¶ 22 Parks told the grand jury that she had been dating defendant on and off for three years when he came to her house in the early morning hours of June 9, 1991, and asked her to take a ride. *Id.* Parks told him that her mother would not allow her to leave the block, so they walked to 439 East 111th Place. *Id.* When they arrived and entered the vestibule, defendant unscrewed the lightbulbs before he pulled a gun out of his waistband and put it on the ledge. *Id.* Shortly thereafter, White, Range, and a woman named Annette came into the building. *Id.* White hugged defendant and then sat on the ledge to talk. *Id.* Defendant tried to cover the gun with his arm. *Id.*

¶ 23 When White, Range and Annette went upstairs, White asked defendant if he wanted privacy and he told her "no" and stayed with Parks on the first floor, as everyone went upstairs. *Id.* Two minutes later, defendant went to the second floor and knocked on the apartment door. *Id.* White told him that it would cost him some cocaine or $10 for a room. *Id.* When he told her he had neither, White and defendant went to talk to Range while Parks stood near the bathroom door where she could hear Range and defendant arguing. *Id.*

¶ 24 Shortly afterwards, defendant and Parks went into the hallway, defendant told her that the people inside were begging for cocaine and that "he should go in there and shoot all four of them,

and maybe they have a better life." *Id*. at 1026. White reappeared and told defendant that Rudolph, who was sleeping on the couch, had some cocaine. *Id*. Defendant went back into the kitchen while Parks sat on the couch. *Id*. Parks heard defendant arguing with Range and Campbell in the kitchen, but she saw Campbell go into the dining room with a bowl and start eating. *Id*.

¶ 25    White and Annette left, and Range told Parks to leave. *Id*. As she was leaving, she overheard defendant remind Range that he used to sell drugs to Range's brother. *Id*. She did not see anyone with a gun in the apartment, but soon after leaving the building, she heard two gunshots, then saw defendant coming down the street. *Id*. Defendant put a gun in his waistband, then told Jimmy and Snake that he "just shot him, they're dead." *Id*. Defendant then got into a car and left. *Id*.

¶ 26    ASA Lynch read Parks' written statement to the jury in its entirety, and ASA Black testified about the circumstances surrounding Parks' grand jury testimony but did not read it to the jury. *Id*.

¶ 27    The record reveals that the State presented evidence of the circumstances surrounding defendant's ultimate arrest to prove guilt of consciousness. Detective McDermott testified that on July 25,1991, he was part of a team that was executing a warrant for defendant's arrest at 5915 South Marshfield in Chicago. His role was to watch the perimeter of the building. He heard the officers serving the warrant announce themselves then he heard a noise above him. He looked up and saw defendant straddling a windowsill on the second floor with one arm and one leg out. He told the other officers that defendant was trying to get out, then told defendant to go back inside.

¶ 28    The record also established that on June 12, 1991, Detective Friel went to 220 West 108th Place where he spoke with defendant's mother. She told him that defendant was not home and he gave her his business card, however, defendant never contacted him. On July 25, 1991, he went to

5915 South Marshfield along with several other officers after receiving information that defendant would be at that location. Other officers secured the premise while Friel went to the front door, knocked and announced his office. He then heard shouts from outside that defendant was fleeing. Friel forced the first floor door and went upstairs to the second floor. He once again announced himself and subsequently forced open that door. Friel testified that once inside, he identified defendant as the subject of the arrest warrant and arrested him.

¶ 29    Defendant presented the testimony of Park's parents, who testified that the police took their daughter and questioned her at the police station. *Fields*, 285 Ill. App. 3d at 1026. Mrs. Parks stated that her daughter told her she was forced to make a false statement to the police. *Id*.

¶ 30    After hearing closing arguments, the jury found defendant guilty of two counts of first degree murder of Range and Campbell. *Id.* At defendant's sentencing hearing, the trial court found that defendant was eligible for the death penalty, but that sufficient mitigating factors precluded him from being sentenced to death. *Id.* Instead, he was sentenced to two terms of natural life imprisonment without parole. *Id*.

¶ 31                                  C. Prior Appeals

¶ 32    On direct appeal, defendant claimed that: (1) he was denied a fair trial by the State's improper use of out-of-court statements; (2) the trial court impermissibly hastened the verdict by telling the jury that their transportation was waiting, and; (3) he was not proven guilty beyond a reasonable doubt. We affirmed defendant's conviction and sentence. *Fields*, 285 Ill. App. 3d at 1030. With respect to defendant's claim on direct appeal that he was not proven guilty beyond a reasonable doubt, he argued that the only evidence linking him to the murders was the prior inconsistent statements of Rudolph and Parks, which contradicted each other in critical ways, were

severely impeached by their trial testimony, and did not significantly implicate him in the shootings. *Id*. This court disagreed, finding that the inconsistencies were not so improbable or unsatisfactory that they created a reasonable doubt as to defendant's guilt. *Id.* Rather, this court found that they affected the witnesses' credibility, and considering all the evidence in the case in the light most favorable to the State, a rational juror could have found the essential elements of first degree murder beyond a reasonable doubt. *Id.* at 1030-31.

¶ 33    As noted above, defendant's initial postconviction petition was filed on June 30, 1998, and summarily dismissed on July 17, 1998. Defendant appealed, however, on May 7, 1999, and prior to this court's disposition of defendant's first postconviction appeal, defendant filed a second postconviction petition. That petition was also dismissed.

¶ 34    On June 5, 2018, defendant sought leave to file his second successive postconviction petition, claiming actual innocence. As noted in defendant's prior appeal, he attached six affidavits to the petition, his own, and affidavits from Alesha Parks, Andrew Rudolph, Thomas London, Celeste Brown, and James Hopkins. In support of his actual innocence claim, defendant argued that the affidavits of Brown, London, and Hopkins were newly discovered evidence indicating that Steven Taylor ("Step"), was responsible for the murders. Defendant argued that Step's involvement was newly discovered evidence as Step was not mentioned in any of the police reports, no witnesses ever identified him, and he was never identified at trial. For the same reasons, defendant argued the evidence was noncumulative in character. He also asserted that Brown, London, and Hopkins "actively concealed their knowledge" because they were afraid of Step who was a "shot caller." Defendant argued that the new evidence was material because it showed Step's guilt and defendant's innocence. Defendant contended that, given the lack of evidence presented

at trial and with the presentation of the newly discovered evidence from London, Brown, and Hopkins, the jury could reach a different result on retrial. He also indicated that he knew all of those people from the neighborhood at the time of the murders.

¶ 35    As noted in our previous disposition, defendant's motion for leave to file a successive postconviction petition was granted and the petition proceeded to the second stage. On January 14, 2019, the State filed a motion to dismiss, which the trial court granted on July 24, 2019.

¶ 36    Defendant appealed, contending that his actual innocence claim was supported by newly discovered evidence contained in affidavits from Hopkins, Brown and London. We found that neither Hopkins' nor London's affidavits were newly discovered evidence, but concluded that Brown's affidavit was newly discovered evidence. We then remanded the case for a third-stage evidentiary hearing.

¶ 37                      D.  Third Stage Evidentiary Hearing

¶ 38    At defendant's evidentiary hearing, which was held on February 15, 2022, postconviction counsel unsuccessfully attempted to introduce the affidavits of Hopkins and London. The State objected, contending that those affidavits were part of the second stage dismissal which was affirmed by this court, and further that this court's remand was only for consideration of Brown's affidavit which we found was newly discovered evidence. The trial court ultimately barred counsel from presenting them, noting that the appellate court had determined that those affidavits were not newly discovered evidence, thus they were not allowable at the hearing.

¶ 39    Brown testified that she knew defendant as "Warren" from the neighborhood because he was "going with" her friend Lydia, and identified him in court. She was shown her affidavit, dated March 5, 2016, and indicated that she reviewed it prior to court. Brown testified that on the night

of the shootings, June 9, 1991, she was going to a store on 111th Street and Vernon in the Roseland neighborhood at approximately midnight. While outside, she saw defendant with Snake and Jimmy hanging out on 111th Place. She waved at them, and they waved back at her. When Brown arrived at the store, it had just closed, but the clerk opened the door and let her inside to purchase a beverage and some cigarettes. Brown left after making her purchases and walked back down Vernon when she heard what sounded like gunshots "real close," and she hurried back to her car. Brown also testified that she was afraid when heard the gunshots and did not want to "get into that." She stated that she had just walked back past defendant and the group when she saw Step with a gun in his right hand, running towards 112th Place. She indicated that she did not know Step that well but had seen him around the neighborhood. Brown then testified that she later heard that defendant had been arrested for a shooting and had recently learned that Step was dead. She never told anyone what she heard or saw until she was contacted by defendant's attorneys but stated that she had spoken with defendant around 2002. Brown further stated that she never saw defendant with a gun that night, did not know where the gunshots came from and did not see the shooting.

¶ 40    On cross-examination, Brown confirmed that she never saw anyone but Step with a gun, that she was not with defendant and his group all night, and did not have a conversation with defendant and his group on her way to the store. She admitted that she did not know whether defendant had a gun that night, only that one was not visible to her as she walked by. Brown stated that she spoke with defendant over the phone three to five times over the years since he was incarcerated. She stated that they never talked about the case, but acknowledged that the only reason she was in court was because the defense was very persistent. Brown stated that she

considered defendant a friend, but acknowledged that she never told anyone about what she saw, even though she knew he was charged with and ultimately convicted of the murders. With respect to the night of the shooting, Brown testified that she was in the store approximately 15 minutes and saw Step as he ran in front of her when she was walking back to her car. Brown first stated that Step was running south on Vernon, going the same direction as her, then she stated that he was running north towards 111th Street when she saw him.

¶ 41    Closing arguments were held on June 15, 2022. During closing, the trial court had several exchanges with the attorneys. The court agreed with this court's decision to remand the case for an evidentiary hearing based on Brown's affidavit, and indicated that it read all of the trial proceedings and prior Appellate Court rulings in the case. The court stated that it found Brown's testimony at the evidentiary hearing to be credible, namely that she went to the store just after it closed at midnight and on her way back to her car fifteen minutes later, she heard two gunshots nearby and saw Step with a gun coming from 111th Place. However, the trial court noted that it had to consider Brown's testimony along with the trial evidence that placed the time of the shootings at approximately 1:15 a.m., that one of the witnesses arrived at the apartment at 2 a.m. and the police arrived at approximately 2:25 a.m. The court also noted that one of the trial witnesses testified to smelling gunpowder in the apartment, and one of the officers testified that the victims were still bleeding when they arrived. The trial court concluded that although Brown was credible in her testimony that she heard gunshots at approximately 12:15 a.m., there was a gap of at least an hour or so before the timeframe for the murders.

¶ 42    The State argued that Brown's testimony at the hearing contained additional information that was not included in her affidavit, namely that she knew defendant and considered him a friend,

that she saw him and waved to him on her way to the store, and that she had spoken with him approximately five times since he was incarcerated. The State argued that, had this information been included in Brown's affidavit, it would not have qualified as newly discovered evidence as she was known to defendant when he was arrested and could have been produced earlier.

¶ 43    The trial court issued its ruling on September 7, 2022. In doing so, it recapped Brown's testimony at the evidentiary hearing and the substantive trial testimony and concluded that Brown's testimony essentially indicated that she heard shots fired in the neighborhood around 12:15 a.m., and the trial evidence indicated that the victims were shot between 1:15 a.m. and 1:30 a.m., almost an hour after Brown heard gunshots. The court noted Parks' trial testimony that defendant did not pick her up until 12:40 a.m., which would have been after Brown heard gunshots. The trial court concluded that Brown's testimony did not contain evidence of such a character that it placed the trial evidence in a different light or of such character that it would change the result on retrial, and denied defendant's successive postconviction petition.

¶ 44    Defendant's timely notice of appeal was filed the following day on September 8, 2022.

¶ 45                                ANALYSIS

¶ 46    The issue before this court is whether, after defendant's third-stage evidentiary hearing, the trial court erred in denying defendant's successive postconviction petition based on defendant's presentation of Brown's testimony as newly discovered evidence of defendant's actual innocence claim. Defendant also contends that the trial court erred in barring Hopkins' and London's affidavits at the evidentiary hearing.

¶ 47                          A. Standard of Review

¶ 48    The Act provides a criminal defendant with the means to redress substantial violations of his constitutional rights that occurred in his original trial or sentencing. *People v. House*, 2023 IL App (4th) 220891, ¶ 75. To be entitled to postconviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the challenged judgment. *Id.*

¶ 49    A postconviction proceeding has three stages. *Id.* ¶ 76. At the first stage, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are taken as true, and the trial court is precluded from making any factual or credibility determinations. *Id.* If the petition survives the first stage and proceeds to the second stage, counsel may be appointed. *Id.* ¶ 77. Like the first stage, at the second stage, all well-pleaded facts that are not positively rebutted by the trial record are taken as true and the trial court does not engage in any fact-finding or credibility determinations. *Id.* The question raised in an appeal from a second-stage dismissal is whether the allegations in the petition, liberally construed in favor of the defendant and taken as true, are sufficient to invoke relief under the Act. *Id.*

¶ 50    At the third stage, unlike the first and second stages, the allegations of the petition and affidavits are not taken as true; instead, the trial court acts as a factfinder, making credibility determinations and weighing the evidence. *Id.* ¶ 78. At a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22. The circuit court has wide discretion in deciding what evidence to consider and acts as the finder of act at the evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony. *Id.* When a petition is advanced to a third-stage

evidentiary hearing, where fact finding and creditability determinations are involved, we will not reverse a trial court's decision unless it is manifestly erroneous. *Id.* Manifest error is clearly evident, plain, and indisputable. *House*, 2023 IL App (4th) 220891, ¶ 78. Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident. *Id.* Here, because the trial court made credibility determinations and engaged in factfinding, our standard of review is manifest error.

¶ 51                                B. Postconviction Claim of Actual Innocence

¶ 52    As our supreme court has previously stated, no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence. *People v. Coleman*, 2013 IL 113307, ¶ 94. In order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *Id.* ¶ 96. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Id.* Material means the evidence is relevant and probative of the defendant's innocence. *Id.* Noncumulative means the evidence adds to what the jury heard. *Id.* And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.*

¶ 53    If the trial court determines that the evidence presented at the evidentiary hearing was new, material, and noncumulative, the trial court then must consider whether the evidence places the trial evidence in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *Id.* ¶ 97. This is a comprehensive approach that involves credibility determinations that are uniquely appropriate for the trial court to make; probability, not certainty

is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both old and new together. *Id.*

¶ 54                                      C. This Case

¶ 55     Turning our attention to the case at bar, defendant argues on appeal that the trial court erred in denying his postconviction petition based on a "dubious finding as to a trivial time discrepancy" between Brown's testimony, which the court found to be credible, and the court's own estimate regarding the time of the shooting. Defendant argues that the trial court's "twin findings" that Brown's testimony was truthful and credible and that it was insufficiently conclusive are irreconcilable. He further contends that the trial court's finding of a "purported" time discrepancy was based on an incorrect interpretation of the trial record and a mischaracterization of Brown's testimony. We disagree.

¶ 56     First, defendant's argument ignores the burden that must be met at a third-stage evidentiary hearing by the petitioner (defendant). As noted above, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *Williams*, 2017 IL App (1st) 152021, ¶ 22. The trial court does not take the allegations of defendant's petition as true at the third stage. *House*, 2023 IL App (4th) 220891, ¶ 78. Instead, defendant must meet his burden of proof. *Id.*

¶ 57     Here, defendant did not meet his burden as he failed to show that Brown's testimony was so conclusive that it would probably change the result on retrial. As the trial court noted, Brown's testimony essentially was that she saw defendant, Snake and Jimmy hanging out on a  street in the neighborhood on her way to the store on 111th and Vernon at approximately midnight. She knew defendant from the neighborhood because he was dating her friend Lydia, and they waved to each

other as she walked by. Defendant was still there with Snake and Jimmy when she returned from the store approximately 15 minutes later. As she walked to her car, Brown heard gunshots and she saw Step coming down 111th Place with a gun in his right hand. Brown did not know where the gunshots came from, only that they were nearby, nor did she know who fired the shots. She also did not know whether defendant had a gun that night as she only saw him in passing. Brown got into her car and left the area.

¶ 58    In contrast, the evidence at trial established that the victims were shot sometime after 1 a.m., which was about an hour after Brown stated that she heard gunshots. Parks testified that defendant picked her up at some point between 12:30 a.m. and 12:40 a.m. and they walked over to the apartment building. While she recanted her prior statement that defendant had a gun, Parks' testimony nevertheless established that they were at the apartment building prior to the shooting, almost an hour after Brown saw defendant hanging out with Snake and Jimmy. Parks' testimony also placed defendant with Snake and Jimmy after the shooting. Brown's testimony does not call Parks' testimony into question as it does not refute any of Parks' testimony. Contrary to defendant's assertions, it can be true both that defendant was hanging out with Snake and Jimmy when Brown saw him at midnight and 12:15 a.m., and that defendant was with Parks a half hour later when they walked over to the apartment building; those facts are not mutually exclusive.

¶ 59    Similarly, Rudolph testified that he was asleep in the apartment and was awakened after hearing gunshots at approximately 1:30 a.m. Again, this is more than an hour after Brown indicated that she heard gunshots and saw defendant outside with Snake and Jimmy. While Rudolph recanted his prior statement that he saw defendant standing over the victims with a gun, Brown's testimony does not call Rudolph's testimony into question as it does not refute Rudolph's testimony. As

noted above, it can be true both that defendant was hanging out with Snake and Jimmy when Brown saw him at midnight and 12:15 a.m., and that defendant was in the apartment when Rudolph woke up at 1:30 a.m., which was more than one hour later. Those facts are also not mutually exclusive.

¶ 60      Additionally, the timeframe of the murders was corroborated by other witnesses- Wiley, who discovered the victims when she returned to the apartment at 2 a.m., and the officers who first responded and 2:25 a.m. and found the victims still bleeding. At best, Brown's testimony established that there was possibly a second shooting on June 9, 1991, but it did not establish defendant's actual innocence as it was not conclusive new evidence. We agree with the trial court's assessment that it was not so conclusive that it would probably change the result on retrial when weighed against the other evidence presented at trial, and find that its determination was not against the manifest weight of the evidence. Thus, the trial court properly denied defendant successive postconviction petition.

¶ 61      It bears noting that defendant's argument also fails because Brown's testimony at the evidentiary hearing established that it was not newly discovered evidence at all. As established by the record, Brown's testimony at the evidentiary hearing included evidence not presented in her affidavit. Specifically, Brown testified at the hearing that she knew defendant from the neighborhood because he was dating one of her friends and considered him a friend; they waved to each other as she walked to the store before she heard the gunshots, thus, defendant was aware of her existence prior to and during trial; Brown was aware of defendant's arrest and incarceration but never came forward, nor did defendant ever mention her to his trial counsel; and Brown communicated with defendant three to five times while he was incarcerated between 1991 and

2002, yet did not provide an affidavit until 2016. Although Brown claimed at the evidentiary hearing that she did not discuss the case with defendant or his family over the years, somehow defendant became aware of her statement. Additionally, there was no evidence presented as to how defendant otherwise became aware of her testimony and ultimately had his attorneys get in contact with her to secure her affidavit. None of those additional facts were included in Brown's affidavit that was included with defendant's successive postconviction petition alleging actual innocence based on newly discovered evidence. Had those additional facts been included in the affidavit, Brown's affidavit would not have qualified as newly discovered evidence, and defendant would not have gotten the benefit of a third-stage evidentiary hearing at all. As such, defendant's claims must fail.

¶ 62                          D. Evidentiary Hearing on Brown's Affidavit Only

¶ 63    Although we have already concluded that defendant's postconviction petition was properly denied after his third-stage evidentiary hearing, we address defendant's contention that the trial court's refusal to consider Hopkins' and London's affidavits at the evidentiary hearing was error. The State argued at the hearing that any consideration of those affidavits was outside the scope of the remand. We agree.

¶ 64    On remand, the trial court has no authority to act beyond the scope of the mandate. *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1037 (2011). If the direction of the mandate is to proceed in conformity with the opinion, then the opinion must be consulted in determining the appropriate course of action. *Id.* The entire opinion is relevant. *Id.* If specific directions are not given, but the remand instructions are general in nature, then the lower court should examine the opinion and determine what further proceedings would be consistent with the opinion. *Id.* It is unquestionable

that a reviewing court that issues a mandate has the power to enforce the mandate and determine whether there has been compliance. *Id.*

¶ 65    Here, our mandate was general; it only indicated that the case was reversed and remanded. Thus, the trial court properly looked to the substance of this court's prior disposition to determine what further proceedings were necessary and consistent with the disposition. Our previous disposition explicitly stated that the Hopkins and London affidavits were not newly discovered and that only Brown's affidavit was newly discovered. We then specifically remanded for a third-stage evidentiary hearing based on the newly discovered evidence presented in Brown's affidavit. As a third-stage hearing based on newly discovered evidence necessarily requires consideration of the evidence considered to be newly discovered, it would have been improper for the trial court to consider evidence that this court previously determined was not newly discovered. Accordingly, the trial court did not err in excluding Hopkins' and London's affidavits from consideration at the third-stage evidentiary hearing and defendant's argument fails.

¶ 66                                    CONCLUSION

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County that denied defendant's successive postconviction petition after a third-stage evidentiary hearing.

¶ 68    Affirmed.